Georgia A. Staton, Bar #004863
Ravi V. Patel, Bar #030184
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1752
Fax: (602) 200-7854
gstaton@jshfirm.com
rpatel@jshfirm.com

Attorneys for Defendant Litchfield Elementary
School District Number 79

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| August Jeremy Hoenack, an individual,<br><br>                                              Plaintiff,<br><br>          v.<br><br>Litchfield Elementary School District<br>Number 79, a political subdivision of the<br>State of) Arizona,<br><br>                                              Defendant. | No. 2:22-cv-01903-JJT<br><br>**Defendant's Motion For Summary Judgment** |

116925535.1

The Court should grant Defendant's Litchfield Elementary School District Number 79's ("the District") Motion for Summary Judgment on all of Plaintiff Jeremy Hoenack's claims. Hoenack's First Amendment claim under 42 U.S.C. § 1983 based on having his speech limited at various board meetings all fail as a matter of law because the District was entitled to limit Hoenack's speech when, at the discretion of the Board President, it was disruptive and not related to a meeting's agendized items. Hoenack's various state law claims also fail as a matter of law because: (1) there is no private right of action for damages for an Open Meeting Law complaint nor were there any Open Meeting Law violations, (2) Hoenack's claims regarding events prior to August 15, 2021 are barred by the 1-year statute of limitations (A.R.S. § 12-821) and Arizona's Notice of Claim Statute (A.R.S. § 12-821.01); and (3) Hoenack's various state law claims fail as a matter of law on their merits. Thus, the Court should grant the District summary judgment on all of Hoenack's claims.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND.

#### A.   The District's Board.

Jeremy Hoenack was elected to the Litchfield Elementary School District governing board ("LESD Board") in January 2021. [Statement of Fact ("SOF") ¶ 1]. On January 9, 2024, Hoenack resigned from the LESD Board. [SOF ¶ 2].

Pursuant to A.R.S. § 15-321(D), the District enacted various policies and rules that detailed Board members' duties and obligations. [SOF ¶ 3]. Hoenack testified he reviewed these policies and rules. [SOF ¶ 4]. This included working "harmoniously with other Board members without neglecting a proper share of the work or trying to dominate the Board", "vot[ing] and act[ing] in Board meetings impartially for the good of the District", "accept[ing] the will of the majority vote in all cases, and giv[ing] wholehearted support to the resulting policy" and "represent[ing] the Board and the District to the public in a manner that promotes both interest and support." [SOF ¶ 5]. In addition, the President of the Board is required to "[e]ncourage and maintain orderly and democratic participation," "[k]eep all discussions factual and on the subject at hand", and "[a]llow for full and complete exploration of each

1

item of business." [SOF ¶ 6]. Finally, the President of the Board is "responsible for the orderly conduct of the meeting and shall rule on such matters as the time to be allowed for public discussion, the appropriateness of the subject being presented, and the suitability of the time for such a presentation." [SOF ¶ 7]. This includes the Board President's ability to recess a meeting without a vote in order to maintain decorum as well as bring order to a meeting as a result of a board member's conduct. [SOF ¶ 8].

**B.** **Relevant Board Meetings.**

Hoenack's Complaint largely consists of alleged violations that occurred at various District Board meetings. [Doc. 1-4]. However, as described below, the actions taken by the District were all attempts to curb Hoenack's disruptive and off-topic behavior.

**1.** **The February 23, 2021, Meeting.**

During the February 23, 2021, Board meeting Hoenack proposed certain changes to the proposed teacher's contracts. [SOF ¶ 9]. The Board tabled that discussion until the March 3, 2021, meeting so the proposed changes could be addressed by the District's counsel. [SOF ¶ 10]. Hoenack was never cut off or precluded from speaking during this meeting. [SOF ¶ 11].

**2.** **The March 3, 2021, Meeting.**

During the March 3, 2021, Board meeting, the Board met to discuss teacher employment contracts and staff work agreements. [SOF ¶ 12]. Hoenack, however, raised issues regarding Critical Race Theory ("CRT") and the Equity Statement.[1] [SOF ¶ 13]. These topics were not on the Board's agenda to be discussed. [SOF ¶ 15]. Hoenack was allowed to continue to speak as long as his comments were related to the matters noticed on the Board's agenda. [SOF ¶ 16]. However, Hoenack continued to attempt to discuss the Equity Statement and CRT. [SOF ¶ 17]. Board President Clymer moved for the Board to vote on the approval of the existing contract language after Hoenack continued discussing CRT and the Equity Statement, instead of his proposed changes to the contract language. [SOF ¶ 18]. She did so

---

[1] The Equity Statement was designed to address potential inequity that may inherently exist within LESD. [SOF ¶ 14]. The Equity Statement was adopted by the Board in December 2020 following full discussion in open meetings. [*Id.*].

because she believed Hoenack's comments regarding the Equity Statement and CRT did not relate to the teacher employment contracts and staff work agreements that had been noticed for the March 3, 2021 meeting. [SOF ¶ 19].

Following this meeting, various parents wrote to the Board seeking Hoenack's removal for his disruptive behavior. [SOF ¶ 20]. This meeting was also later investigated by the Arizona Attorney General's office for Open Meeting Law violations due to Hoenack's conduct. [SOF ¶ 21]. The Attorney General's Office found that Hoenack's statements and President Clymer's interruption of those statements did not violate any open meeting laws. [SOF ¶ 22]. The Attorney General's office letter ended with a statement that its assessment of the March 3, 2021 meeting "relates solely to the disposition of the aforementioned Open Meeting Law complaint; it is _not_ a formal opinion of the Attorney General's Office _and should not be cited as authority in other matters_." [SOF ¶ 23 (emphasis added)].

### 3.      The April 13, 2021, Meeting (Paragraphs 90-117).

During the April 13, 2021, meeting, the Board met to discuss communication protocol for Board members.  [SOF ¶ 24]. Instead, Hoenack wanted to discuss a document created by LESD staff discussing equity issues called the Transformational Equity Work (TEW).[2] [SOF ¶ 25]. The meeting became raucous when Hoenack accused Board members of hiding implementation of CRT. [SOF ¶ 28]. Board President Clymer repeatedly asked everyone in the room to "quiet down" or "settle down" so that the meeting could continue forward. [SOF ¶ 29]. Hoenack was allowed to speak for approximately 10 minutes about the District's Equity Statement when the appropriate agenda item was reached, and then agreed to permit other board members to speak on the topic after he finished. [SOF ¶ 30].

### 4.      The April 27, 2021, Meeting (Paragraphs 118-131).

On April 27, 2021, the Board held a study session to discuss whether the District should have an Equity Statement and what it should say. [SOF ¶ 31]. To facilitate discussion

---

[2] The Equity Statement differed from the Districts' Transformational Equity Work ("TEW"), which was the product of a separate committee by LESD. [SOF ¶ 26].  The TEW was neither the product of the Board's discussion or adoption nor was it voted on or adopted by the Board. [SOF ¶ 27].

of this contentious topic, professional facilitators were brought in to help guide the discussion. [SOF ¶ 32]. When it was Hoenack's turn to speak he went on a diatribe making *ad hominem* attacks stating in part: "The supporters of the Equity Statement by and large acted like children acted like criminals or both. Two of the speakers in support of the Equity Statement were involved in an assault on members of the public…" [SOF ¶ 33]. He called the equity statement "a game, a hoax," and complained that it was "secretly implemented." [SOF ¶ 34]. He was allowed to finish his statement and explain why he opposed an Equity Statement and the discussion moved on. [SOF ¶ 35]. Later, Hoenack began to discuss a "procedure manual" and his concerns about the implementation of the Equity Statement.   [SOF ¶ 36]. When the facilitators attempted to recap some of Hoenack's points, Hoenack raised his voice and talked over the Board President and the facilitator, despite them repeatedly trying to encourage him to "take a breather."   [SOF ¶ 37]. Ultimately, Board President Moran had to adjourn the meeting for two minutes to allow Hoenack to calm down. [SOF ¶ 38]. Hoenack was then able to finish his point on the Equity Statement before the proceedings concluded. [SOF ¶ 39].

### 5.     The May 11, 2021, Meeting (Paragraphs 132-146).

During the May 11, 2021 meeting, Hoenack was scheduled to give an "Activity to Unite." [SOF ¶ 40]. An Activity to Unite is an activity that was intended to bring the Board and the community together as part of a "school family." [SOF ¶ 41]. Instead, Hoenack began giving a speech about how LESD had low achievement scores, how United States' businesses were recruiting foreign employees, and claiming that LESD was adopting "radical left agendas to [cause] chaos instead of instead of teaching" and "sanctioning racism."   [SOF ¶ 42]. When another board member commented that Heonack's speech was not an "Activity to Unite", he began to call out individual Board members. [SOF ¶ 43]. Board President Clymer asked Hoenack and the other Board member to "stop and take a breath." [SOF ¶ 44]. Hoenack then continued to talk over President Clymer and was able to close out his statement. [SOF ¶ 45].

### 6.     The June 8, 2021, Meeting (Paragraphs 151-165).

During the June 8, 2021, Board Meeting, the Board audio recorded (but not video recorded) the meeting. [SOF ¶ 46]. Hoenack was given the floor to address a concern

about not videotaping the current Board Meeting as it was being audio recorded only. [SOF ¶ 47]. Dr. Armstead, as the only African American member of the board, responded stating that she requested to audio record only because of personal safety issues she was experiencing due to Hoenack. [SOF ¶ 48]. At the time, Dr. Armstead made no mention that Hoenack had previously committed battery against her or that an Injunction Against Harassment that had been previously filed between Hoenack and Dr. Armstead. [SOF ¶ 49]. In response, Hoenack wanted to discuss these irrelevant personal issues. [SOF ¶ 50]. Because the personal issues between Dr. Armstead and Hoenack were not related to the agenda item of whether video of Board meetings should be streamed, the discussion was redirected. [SOF ¶ 51]. The decision whether to videotape the meetings was then left to the District Superintendent. [SOF ¶ 52].

### 7.     The January 11, 2022, Meeting (Paragraphs 159-165).

Hoenack claims that on January 11, 2022, the agenda provided that the Board would discuss adopting revisions to Governing Board Policy BEDB. [SOF ¶ 53]. The BEDB policy was a policy governing how Board members place topics of discussion on the Board's agenda. [SOF ¶ 54]. During this discussion, Hoenack was given the floor and began to discuss topics that had nothing to do with this issue. [SOF ¶ 55]. When Board President Moran began to comment that Board Meetings should not be political or used to promote ideologies, Hoenack blew up, interrupting her.  [SOF ¶ 56]. He said "Go to Hell – "you're and idiot – you are all idiots" referring to the other Board members. [SOF ¶ 57]. When another Board member tried to intervene and call a point of order to allow Board President Moran to finish before responding, Hoenack continued shouting, calling Board President Moran a liar. [SOF ¶ 58]. Hoenack in response began to discuss why, in his opinion democracy does not work. [SOF ¶ 59]. Hoenack then continued to scream at the board, saying: "You guys don't give a damn…" [SOF ¶ 60]. At that point, the Board President recessed the meeting for two minutes to restore order. [SOF ¶ 61].

### 8.     The March 15, 2022, Meeting (Paragraphs 166-180).

On March 15, 2022, the agenda allowed Board members to make a brief presentation on "Reports from Governing Board Members." [SOF ¶ 62]. These Reports are

supposed to be brief discussions of current events related to LESD that should only be 1-2 minutes. [SOF ¶ 63]. Hoenack began his "report" by talking about a movie he watched called "Whose Children Are They?" [SOF ¶ 64]. He then began discussing a host of topics that did not involve LESD, including: (1) the role of communism in education, (2) claiming that the Department of Education was formed during the Carter Administration to use schools to destroy the family, (3) the formation of the Eastern Bloc, the fall of the Berlin wall, how global warming is a myth promulgated by communists, (4) how Vladamir Putin believes that he is entitled to preferential treatment, and so was invading Ukraine, and (5) how Joe Biden "shut down" American energy and implied that this financed the invasion of Ukraine. [SOF ¶ 65]. After allowing Hoenack to speak for about 5 minutes on these topics, President Moran asked him to relate his comments to LESD. [SOF ¶ 66]. Hoenack then screamed at Board President Moran telling her to "go to hell" and "I will talk louder" and "keep your mouths shut." [SOF ¶ 67]. Board President Moran said Hoenack could continue talking if he related his comments to LESD. [SOF ¶ 68]. Hoenack did not. Instead, he continued to yell at Ms. Moran, telling her to "shove it" and "shut the hell up." [SOF ¶ 69]. At that point, the Board voted to conclude the meeting. [SOF ¶ 70]. Hoenack later admitted that he lost his temper during this meeting. [SOF ¶ 70].

**C.**   **The Injunction Against Harassment Proceedings By Kimberly Moran.**

On March 21, 2022, Kimberly Moran filed a petition for Injunction Against Harassment ("IAH") against Hoenack. [SOF ¶ 71]. Ms. Moran's IAH was brought on her own accord and without any approval of the Board. [SOF ¶ 72]. The IAH was based on Hoenack's conduct during the January 11, 2022 and March 15, 2022 board meetings. [SOF ¶ 73]. It was granted that same day. [SOF ¶ 74]. The IAH provided that Hoenack have no in person contact with Ms. Moran and would attend school board meetings via Zoom/remote sessions. [SOF ¶ 75]. Hoenack challenged this ruling, and it was affirmed. [SOF ¶ 76].[3] In affirming the IAH,

---

[3] Hoenack admits that during his hearing challenging the IAH, he was able to have the judge listen to various recordings, including a video of the board meeting occurring on March 15, 2022, had an opportunity to cross-examine witnesses, and present evidence before the court affirmed the IAH as well. [SOF ¶ 77].

the justice court recognized Hoenack's conduct could be "construed as a criminal act of disorderly conduct" and that his behavior "I believe, crossed into criminal lines." [SOF ¶ 78]. Hoenack then appealed this ruling to superior court, which also affirmed the IAH ruling. [SOF ¶ 79].

### D.      The Alleged Zoom Issues.

Following the denial of Hoenack's IAH appeal he could not attend Board meetings in the same room as the other Board members. [SOF ¶ 80]. Hoenack then participated in the Board's meetings via Zoom, after which he began complaining of technical issues he claims he experienced. [SOF ¶ 81].

To begin, none of the Board members or anyone from the District intentionally caused or created the technical issues Hoenack claims he experienced. [SOF ¶ 82]. Indeed, the District did everything it could think of to ensure that there were no technical issues during any LESD Board meeting. [SOF ¶ 83]. For example, to avoid technical problems altogether, the District proposed that Hoenack participate in board meetings from another location within the District, such as one of the schools, the District Office, or Support Services. [SOF ¶ 84]. This would have allowed the District to have IT personnel on both sides of the Zoom connection to assist with any connection or sound issues. [SOF ¶ 85]. Hoenack declined to do so. [SOF ¶ 86]. The District also offered to have its IT Director go to Hoenack's home to check to see if the technical issues he was experiencing was something on this end. [SOF ¶ 87]. Again, Hoenack refused this as well. [SOF ¶ 88].

Regardless, the District IT staff rewired the board room in an effort to resolve the alleged sound issues Hoenack complained about. [SOF ¶ 89]. In addition, the District also made sure it had onsite personnel participating on the Zoom meetings and operating the sound board and available to troubleshoot any issues. [SOF ¶ 90].  The District also added new equipment ensure there was no sound issues, spending roughly $7000-8000 dollars to replace existing equipment.  [SOF ¶ 91].

If technical issues arose with Zoom, the Board meeting was either recessed to address the issue or other affirmative actions were taken by District staff to assist Hoenack in

participating in the Zoom meetings. [SOF ¶ 92]. For instance, the March 29, 2022, meeting was delayed until technical issues with audio could be addressed. [SOF ¶ 93]. When Hoenack sent a text message to Superintendent Gunning on March 29, 2022, indicating some difficulty he was having with Zoom, Superintendent Gunning sent him a new link to ensure that he could hear. [SOF ¶ 94]. When it resumed, Hoenack was able to participate. [SOF ¶ 95]. On April 12, 2022, at 7:08 p.m. Superintendent Gunning texted Hoenack to ensure he could hear as the Board was coming off a recess.  [SOF ¶ 96]. On October 18, 2022, when Hoenack raised a sound issue Superintendent Gunning notified IT Director Brad Cruz. [SOF ¶ 97]. A few minutes later, Hoenack confirmed that the sound was better. [SOF ¶ 98]. During the October 18, 2022, Board Meeting, Hoenack was able to participate, confirming that he was able to hear the presentation of Executive Director of Finance Michael Vaughn, [SOF ¶ 99]. However, he later had technical issues, and so a recess was taken while the Zoom meeting was restarted. After the recess, he was invited to rejoin, but declined to do so. [SOF ¶ 100].

By November 2022, any technical issues appear to have been resolved. [SOF ¶ 101]. During the November 15, 2022, Board Meeting, Hoenack was able to participate. [*Id.*]. At one point, Hoenack reported that he couldn't hear someone, and that person was given a new microphone, after which, Hoenack continued to ask questions and fully participate in the meeting. [*Id.*]. During the November 29, 2022, Board Study Session, Hoenack was able to participate and comment multiple times without issues. [SOF ¶ 102]. By January 17, 2023, Hoenack admits there were no longer any technical issues. [SOF ¶ 103]. Hoenack then returned to physical board meetings in March 2023 after the IAH against him expired. [SOF ¶ 104].

**E.    Hoenack Has No Evidence Of Severe Emotional Distress.**

The medical records disclosed in this matter do not reveal any emotional distress as the result of this litigation. Hoenack was diagnosed with ADHD since the age of 19. [SOF ¶ 105]. As part of this diagnosis Hoenack was prescribed Ambien since the late 1990's. [SOF ¶ 106]. His medical records indicate that he has had "no change in medical status, no new medications, no recent hospitalizations", that his "attention/concentration is good",

1    he is "sleeping well", "he is coping well with ongoing legal stressors", and that Hoenick "denies

2    depressive symptoms, no mania, no delusions, no AVH, no SI/HI." [SOF ¶ 107]. Finally,

3    Hoenack also could not identify any person from the District who allegedly gave out his

4    private information, including his home address, to the public. [SOF ¶ 108]. Nor could he

5    identify anyone, let alone an individual from the District, that allegedly vandalized his home.

6    [SOF ¶ 109].

7           **F.      Hoenack's Request For A Preliminary Injunction Was Denied.**

8                 Hoenack sought an order from this Court seeking, among other things, a

9    Declaration that the IAH was null and void and also a Declaration that his business and

10   reputation had been damaged to the tune of $64 million. This Court denied these requests in

11   full, commenting that "Plaintiff does not provide authority or persuasive argument that the

12   technical problems with Zoom give rise to an actionable First Amendment claim."  [Doc. 24].

13   **II.    HOENACK'S § 1983 FIRST AMENDMENT CLAIMS FAIL.**

14                The Supreme Court has held that a plaintiff pursuing a First Amendment

15   retaliation claim must show "that the government took an 'adverse action' in response to his

16   speech that 'would not have been taken absent the retaliatory motive.'" *Houston Community*

17   *College System v. Wilson*, 142 S. Ct. 1253, 1260 (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722

18   (2019). But where a school Board "has an agenda to be addressed and dealt with," public

19   forum or not, the usual First Amendment "antipathy to content-oriented control of speech

20   cannot be imported into the [Board] chambers intact." *White v. City of Norwalk*, 900 F.2d 1421,

21   1425 (9th Cir. 1990). Thus, "in dealing with agenda items, the [Board] does not violate the

22   [F]irst [A]mendment when it restricts public speakers to the subject at hand." *White* 900 F.2d

23   at 1425 (citing *Madison School Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175

24   n. 8 (1976)); *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271–72 (9th Cir. 1995); *Dehne*

25   *v. City of Reno*, 222 Fed. Appx. 560, 562 (9th Cir. 2007). And as critically important to this case,

26   a board can stop a speaker whose speech becomes "irrelevant or repetitious" or whose speech

27   "disrupts, disturbs, or otherwise impedes the orderly conduct of the meeting." *White*, 900 F.2d

28   at 1425-1426. "A speaker may disrupt a Council meeting by speaking too long, by being unduly

9

repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner. Indeed, such conduct may interfere with the rights of other speakers." *Id.* And because the point at which speech becomes unduly repetitious or largely irrelevant is "not mathematically determinable", the Ninth Circuit affords the moderator "a great deal of discretion." *Id.*

Here, Hoenack's Complaint alleges his First Amendment rights were violated during the Board's meetings on 2/23/21, 3/3/21, 4/13/21, 4/27/21, 5/11/21, 8/10/21, 1/11/22, and 3/15/22 after the Board either cut off him off when speaking or took a break to restore order.[4] [Doc. 1-4 at ¶ 202-220]. In addition, Hoenack alleges his First Amendment rights were limited by technical issues he experienced when attending meetings virtually on Zoom. [*See generally* Doc. 36]. As more fully set forth below, none of the issues Hoenack alleges give rise to a First Amendment violation under 42 U.S.C. § 1983.

### A.   The District Did Not Violate Hoenack's First Amendment Rights.

As described above, the Board's conduct in interrupting, limiting, or stopping Hoenack from speaking was an attempt to limit the discussions to the agendized items and to maintain order in the face of Hoenack's escalating and disruptive behavior. This did not constitute a violation of Hoenack's First Amendment rights.

First, with regard to the February 23, 2021, meeting, there was no violation of Hoenack's First Amendment rights. Hoenack was never cut off or precluded from speaking during this proceeding, and therefore, none of his First Amendment rights were implicated. Moreover, to the extent a discussion did not occur regarding Hoenack's proposed changes to teacher's contracts, that was because it required the presence of attorneys to address the legality of whether those changes could be made. The Board tabled that discussion until the March 3, 2021, meeting so it could be addressed with the presence of counsel. There was no retaliatory act or First Amendment violation in so doing.

---

[4] Hoenack later sought to add additional claims and allegations to his complaint, which this Court denied. [*See e.g.,* Docs. 52, 60].

Second, with regard the Board and/or its President limiting Hoenack's speech during the March 3, 2021, April 13, 2021, April 27, 2021, May 11, 2021, August 10, 2021, January 11, 2022 and August 10, 2022 meetings, there was no First Amendment violation. As extensively noted above, Hoenack was either permitted to conclude his speech or only limited from speaking after being warned he was either off topic, or disruptive to the Board's meeting. For example:

- At the March 3, 2021 meeting, Hoenack raised issues regarding CRT and the District's Equity Statement, which were not agendized. The Board attempted to redirect Hoenack, but he refused to stay on subject, leading to the Board interjecting when Hoenack was speaking and to approve the agendized item (teacher employment contract language).[5]

- On April 13, 2021, the Board met to discuss communication protocols amongst board members, during which Hoenack created a scene when accusing Board members of hiding implementation of CRT and creating repeated outbursts amongst the attending public and Hoenack. Hoenack was still allowed to make his point for 10 minutes and then ceded the floor for other board members to speak.

- On April 27, 2021, the Board had facilitators come in to assist in the discussion of whether there should be an Equity Statement, during which Hoenack went on a diatribe making *ad hominem* attacks against the individual Board members. Hoenack became increasingly frustrated and hostile at the mediator's attempt to have a civil discussion and incorporate the viewpoints of all the Board members. The Board President was required to adjourn the meeting for two minutes for Hoenack to calm down – after which Hoenack was still able to finish his point on the Equity Statement.

Hoenack continued to be disruptive by having loud unjustified outbursts when he attempted to have entirely off-topic discussions regarding political issues and various other topics entirely unrelated to the District's business during the May 11, 2021, June 8, 2021, and January 11, 2022, meetings. This culminated in Hoenack's most aggressive explosion during the March

---

[5] While the AG's office found that Hoenack was not violating the Open Meeting Laws when speaking during this meeting, its findings were explicitly limited to assessing just that – Open Meeting Laws – not whether any First Amendment Rights were violated. Moreover, to the extent the AG's letter has any relevance (which it does not), it also did not find any Open Meeting Law violations for the Board President's decision to redirect Hoenack either.

15, 2022, meeting where Hoenack himself admitted he lost his temper when attempting to discuss a variety of entirely irrelevant and unrelated topics to the District's business.

Finally, on August 10, 2021, Hoenack claims that the Board violated his First Amendment rights by structuring the agenda and meeting to limit discussion prior to voting for a New Equity Statement. Essentially, he states that he "was weary and intimidated with the futility of trying to discuss the negative consequences of the Equity Statement…." In other words, he claims that his First Amendment rights were violated even though he did not attempt to speak because he did not want to be criticized by the public. That is not a First Amendment violation since he chose not to speak and was not silenced by the Board.

In short, nothing in the First Amendment mandates that a Board member be permitted to speak on a topic that is determined by the Board President to be outside the agenda. Moreover, interrupting Hoenack to inform him that he was "off the agenda" does not implicate his First Amendment rights. The fact that Hoenack claims he felt humiliated by being called to task is not suppression of his speech but a natural consequence of his improper behavior. The First Amendment does not require a Board member or a member of the public be given the opportunity to take over a public meeting. Indeed, Hoenack's conduct during the January 11, 2022 and March 15, 2022 meetings was determined to be harassment under Arizona law (A.R.S. § 12-1809(T)(1)(a)), which was affirmed on appeal. And while Hoenack will almost certainly disagree with the aforementioned points, it bears repeating that the Ninth Circuit affords a Board President considerable discretion to determine when a speaker is disrupting Board business and how to accomplish the business of the Board in a reasonably efficient manner. Given Hoenack's repeated, off-topic, disruptive, and blatantly unprofessional and offensive conduct, the Board and/or its President did not violate his First Amendment rights when action was taken – consistent with Board policy – to minimize Hoenack's disruption to the various Board meetings at issue.

**B.      Hoenack's Claims Related To Moran's IAH Is Not A Cognizable First Amendment Claim Against The District.**

Hoenack also appears to bring First Amendment claims based on Kimberly Moran's IAH. But this Court already recognized that the Board neither initiated nor was a

12

party to the IAH proceeding. [Doc. 24 at 5:11-6:11]. This was solely the individual decision of Kimberly Moran. In this regard, there is no respondeat superior liability by the District for the alleged acts of its individual members taken in their own personal capacity under Section 1983. *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978). Nor is Ms. Moran's private initiation of an IAH acting under "color of law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (A person acts under color of law for purposes of 42 U.S.C. § 1983 if he "exercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.").  In addition, the IAH was issued by the Hassayampa Justice Court and upheld in the subsequent evidentiary hearing, during which the Court reviewed the video footage of the incidents upon which the request was made and found that Hoenack's actions could be considered criminal "disorderly conduct." When Hoenack appealed the Justice Court's Decision, that Court, too, upheld the IAH. Thus, the District did not restrict Mr. Hoenack's participation in board meetings to Zoom. That is the result of an IAH that was appealed and upheld. And any further challenge to the IAH Zoom restriction is not appropriate in this action. [Doc. 24 at 6:12-7:9].

C.     **The Technical Issues Hoenack Experienced Via His Zoom Attendance At Board Meetings Did Not Violate His First Amendment Rights.**

Hoenack's Supplemental Complaint alleges that "[v]irtually every meeting from March 29, 2022 to January 17, 2023 had audio problems." [Doc. 36 at ¶ 22]. Hoenack then references examples regarding the October 18, 2022 meeting [*Id.* at ¶¶ 23-26], the November 29, 2022 meeting [*id.* at ¶¶ 28-30], the January 10, 2023 meeting [*id.* at ¶ 31-32]. However, none of the technical problems Hoenack alleges give rise to a First Amendment violation.

As already noted by the Court, "Plaintiff has not shown that the District took any material adverse action against him with respect to the Zoom-only restriction imposed by the Justice Court, let alone an action that 'would not have been taken absent the retaliatory motive.'" [Doc. 24 at 5:28-6:3 (quoting *Wilson*, 142 S. Ct. at 1260)]. While there appears to be some technical problems that occurred during some of the meetings Hoenack attended via Zoom, the evidence shows the District was implementing or attempting to implement reasonable measures to address these problems. [Doc. 24 at 3].

13

Again, the District offered Hoenack a separate space onsite for Board-meeting participation. Hoenack refused, suggesting "each and every Board member to be on Zoom in their own little hidey-hole." In a subsequent email exchange, Hoenack again rejected an offer from the District to utilize on-site space nearby his home. The Board also rewired the entire meeting space in an effort to avoid audio issues and spent thousands of dollars purchasing new equipment to make sure Zoom meetings went as smooth as possible. To the extent Hoenack experienced technical issues on Zoom during its Board meetings, the Board moved to correct those issues during the meeting, whether it was an audio or video issue. The District made sure that several IT staff were present physically and virtually during Board meetings to assist if the need arose. And while it goes without saying, none of the Board members or anyone from the District intentionally caused or created the technical issues Hoenack claims he experienced.

Thus, there is simply no evidence, beyond Hoenack's speculation, that the technical Zoom issues he experienced violated the first amendment or resulted from actions which would not have been taken absent retaliatory motive. As such, the evidence only further supports this Court's previous determination that "Plaintiff does not provide authority or persuasive argument that the technical problems with Zoom give rise to an actionable First Amendment claim" [Doc. 24 at 6:8-11]. Accordingly, the technical issues Hoenack experienced following the IAH ruling do not give rise to cognizable First Amendment claims.

III.   **HOENACK'S STATE LAW CLAIMS ALL FAIL.**

A.   **Hoenack's Claims Under Arizona's Open Meeting Law Fails.**

1.   **The OML Does Not Allow A Private Right Of Action For Damages.**

Arizona's Open Meeting Law ("OML") is not a tool for an individual person to seek and obtain damages for a perceived inability to speak during a meeting. Rather, the OML only allows an individual to sue seeking to void an action taken by a public body, if the action was taken in violation of the OML (i.e. was not taken in a public meeting).

Arizona's OML requires public bodies to conduct meetings publicly so "all persons so desiring shall be permitted to attend and listen to the deliberations and

14

proceedings" and "legal action of public bodies [occurs only] during a public meeting." *Puente v. Arizona State Legislature*, 254 Ariz. 265, ¶ 1, 521 P.3d 1007, 1009 (2022) (citing A.R.S. §§ 38-431(6), 38-431.01(A)). Arizona's OML requires that the public receive notice of meetings that include the dates and times of meetings and an agenda listing the items to be discussed, considered or decided at the meeting. A.R.S. § 38-431.02(H).  Meetings of the public body must be open to the public (when not in executive session). A.R.S. § 38-431.01(A); A.R.S. § 38-431.03 (executive sessions). Minutes and/or recordings of the meetings must also be kept. A.R.S. § 38-431.01(B) & (C).  A properly noticed meeting at which a public body takes action on properly noticed agenda items complies with the OML. A.R.S. § 38-431.09.

The Open Meeting Law _only_ allows an individual to bring suit "for the purpose of requiring compliance with, or the prevention of violations of, [the Open Meeting Law], by the public body as a whole, or to determine the applicability of [the Open Meeting Law] to matters or legal actions of the public body." A.R.S. § 38-431.07(A). _It does not allow an individual to sue for damages or civil penalties._ Only the Attorney General may to request a court to assess a civil penalty against individuals who knowingly violate the Open Meeting Law. *Id.* Such a lawsuit may only be brought "_against an individual member of a public body for a knowing violation of this article,_" and "in such a suit the court may impose a civil penalty..." *Id.* "The civil penalties awarded pursuant to this section shall be deposited into _the general fund of the public body concerned._" *Id.*

In this case, there are no individual defendants (only the District), and any civil penalties would be required to be placed in the general fund of the District, making an award of a monetary penalty against the District an absurdity. Thus, because Hoenack's lawsuit is brought by an individual plaintiff, and not the Attorney General's Office, he has no private right of action for damages.[6] The only remedy Hoenack can seek is a declaration that certain acts violated the Open Meeting Law.  But, for the reasons set forth below, he has not met his burden of showing that he is entitled to such relief.

---

[6] While A.R.S. § 38-431.07(A) does allow an individual to seek "reasonable attorney's fees," this relief does not apply in this case.  Plaintiff is not represented by counsel and so is not entitled to an award of attorney's fees.

## 2.    Hoenack Cannot Demonstrate Any OML Violations.

As explained above, no provision of the OML allows a board member to speak without restriction. To the contrary, the OML restricts a board member to speaking only on agendized items, so that the public has notice of the topics being addressed at each meeting. Hoenack does not assert that the District Board members discussed matters outside of the agendized items. Hoenack's claim is that the agenda was unduly restrictive and that he was not allowed to say everything he wanted to. [*See* Doc. 1-4 at ¶¶ 202-222]. But similar to his First Amendment claims, that is not a violation of the OML.

Hoenack bases the allegations in his complaint on two provisions of the Open Meeting Law, which he claims were violated.  The first provision, A.R.S. § 38-431.01, requires that all Board action only be discussed and performed during noticed public meetings, that such meetings be recorded and have minutes taken, that such minutes be made publicly available, that anyone can record any part of a public meeting. *See id.* at (C)-(J). In addition, A.R.S. § 38-431.02(H) states only that "[a]gendas required under this section shall list the specific matters to be discussed, considered or decided at the meeting. The public body may discuss, consider or make decisions only on matters listed on the agenda and other matters related thereto." A.R.S. § 38-431.02(H).

In his complaint, Hoenack alleges Open Meeting Law violations occurred (1) during the Board Meetings discussed at length above, (2) the action of Board Member Moran in filing a police report, and (3) the testimony of three board members as witnesses in injunction against harassment proceedings before the Hassayampa Justice Court. [Doc. 1-4 at ¶¶ 202-222]. None of the allegations reflect a violation of OML. All of the Board meetings in question were properly noticed and livestreamed on YouTube and remain available online. Moreover, the IAH proceeding before the Hasasyampa Justice Court was not a legal action by the Board, they were a judicial action by the Justice Court. *See* A.R.S. § 38-431(3) ("'Legal action' means a collective decision, commitment or promise *made by a public body* pursuant to the constitution, the public body's charter, bylaws or specified scope of appointment and the

laws of this state."). Thus, even if Hoenack could bring a claim for damages based on OML violations (which he cannot), no such claim exists.

**B.     Hoenack's State Law Tort Claims All Fail.**

**1.     Hoenack's State Law Tort Claims Fail Due To Legislative Immunity.**

As a threshold issue, the acts Hoenack largely asserts that form the basis of his state law tort claims are based on conduct by the District's board members while they were acting in their capacity as board members during board meetings. But when acting in their capacity as board members, the District and its board members have legislative immunity. This is particularly true when the Board is meeting to discuss District policies. *See* A.R.S. § 12-801.01(A) ("A public entity shall not be liable for acts and omissions of its employees constituting either of the following: 1. The exercise of a judicial or legislative function."); *see also Arizona Independent Redist. Comm'n v. Fields*, 75 P.3d 1088 (Ariz. App. 2003) (recognizing that legislative immunity exists in Arizona to shield public officials acting in a legislative capacity "regardless of his or her particular location within government"); *Sanchez v. Coxon*, 854 P.2d 126 (Ariz. 1993) (concluding that council members have absolute legislative immunity from liability for defamatory statements made in a legislative meeting). This alone mandates summary judgment on Hoenack's various state law claims against the District premised on actions Board members took during Board meetings.

**2.     The District's State Law Liability is Limited To The Time Period Between August 15, 2021 and January 18, 2022.**

In addition, to the extent Hoenack brings state law claims of IIED, Defamation, and/or False Light, such claims can only exist between the narrow period of August 15, 2021 and January 18, 2022. That is because any claims predating one year of the Complaint being filed on August 15, 2022 (i.e., before August 15, 2021) are barred by A.R.S. § 12-821. Thus, Hoenack's state law tort claims based on conduct occurring during the March 3, 2021, April 13, 2021, April 27, 2021, May 11, 2021, and August 10, 2021 board meetings are all barred by the one-year statute of limitations. A.R.S. § 12-821.

17

In addition, Hoenack also must have complied with Arizona's Notice of Claim statute in order to sue the District. *See* A.R.S. § 12-821.01(A). Hoenack served a notice of claim on the District on January 18, 2022. [SOF ¶ 110]. Yet, Hoenack's Complaint and references incidents that occurred after that date, such as the March 15, 2022 board meeting, and various technical issues Hoenack's Supplemental Complaint claims he experienced between March 2022 and March 2023 when attending Board meetings on Zoom. Without filing a timely notice of claim related to those meetings or issues, however, Hoenack is barred from bringing any state law claims that *postdate* his January 17, 2022 notice of claim.[7] *See* A.R.S. § 12-821.01(A); *see also Sanchez-Ravuelta v. Yavapai Cnty.,* 2024 WL 1425591, at *5, ¶¶ 20-21 (App. Apr. 3, 2024) (discussing requirement that notice of claim contain facts sufficient to put governmental entity on notice that gives rise to claims later filed in the Complaint); *Haab v. Cnty. of Maricopa*, 219 Ariz. 9, 13, ¶ 20 (App. 2008) (noting facts that arise after the notice of claim is filed do not put the public entity on notice of liability).

### 3.    The District Did Not Defame Hoenack Between August 14, 2021, and January 18, 2022.

Hoenack alleges that certain Board member's comments that he was "off topic" or criticized by the Board during its meetings at the March 3, 2021, April 13, 2021, April 27, 2021, May 11, 2021, June 8, 2021, August 10, 2021, January 11, 2022, and March 15, 2022 meetings were defamatory. [*See* Doc. 1-4 at ¶¶ 226-235]. To establish a defamation claim, Hoenack must prove that the District published a false and defamatory communication regarding Plaintiff which brought him into disrepute, contempt or ridicule or which impeached the Plaintiff's honesty, integrity, virtue or reputation. The publication must "reasonably appear to state or imply assertions of material fact that are provably false." *Yetman v. English*, 168 Ariz. 71, 76 (1991). Hoenack must prove that the District acted with "actual malice", i.e. with knowledge the statements were false or with conscious disregard of their falsity. *Dube v. Likins*, 216 Ariz. 406, ¶ 35, 167 P.3d 93, 104 (App. 2007); *McCoy v. Hassen*, 1 CA-CV 21-0524, 2022

---

[7] And the six month deadline to do so has now long since passed for all relevant events listed in Plaintiff's Complaint and Supplemental Complaint.

WL 3754244, at *3 (App. Aug. 30, 2022), *review denied* (Jan. 6, 2023). Hoenack must also prove that he suffered damages as a result of the publication. *Id.*

Hoenack's defamation claim fails for multiple reasons. First, except the January 11, 2022, meeting, all of these meetings are subject to either the 1-year statute of limitations A.R.S. § 12-821 or notice of claim issues and are not actionable. *See supra* § III(B)(2). And with regard to the January 11, 2022, meeting, that was already the subject of the IAH meeting where Hoenack's conduct was found to be harassing and potentially criminal in nature.

Second, any alleged defamatory statements made by the Board members during the board meetings were privileged, because: (1) they were made during quasi-legislative meetings of the Governing Board, and (2) made pursuant to the legitimate interest of the governing board to discuss these matters. *See supra* III(B)(1).

Third, Hoenack has not pled or identified a specific statement that establishes *the District* allegedly defamed him. While Hoenack generally refers to statements made during board meetings, he does not identify any specific, allegedly defamatory, statement at issue that can be attributed to the District. [*See* Doc. 1-4 at ¶¶ 226-235]. For this reason alone, his defamation claim fails.

Fourth, to the extent Hoenack bases his defamation claim on individual board member statements or conduct that occurred outside of Board meetings, those statements cannot be attributed to the District because it does not constitute District action. A.R.S. § 15-421(A) ("The governing body of a school district shall be a governing board."); *see also* A.R.S. § 15-341(A) (powers of governing board); A.R.S. § 38-431(3).

Fifth, Hoenack cannot prove any of the alleged defamatory statements (whatever they are) were stated with actual malice. The statements that were made by the Board members were made in the midst of Hoenack insulting the various board members or being disruptive to the Board meeting and were truthful in characterizing Hoenack being "off topic." But to the extent those discussions are put at issue, once again, the record demonstrates that any statements made by the Board members as a whole were an attempt to calm proceedings so that the District's business could be conducted. There is simply no evidence

1    of actual malice, and Hoenack cannot satisfy his burden to demonstrate otherwise. *See Orme*

2    *Sch. v. Reeves*, 166 Ariz. 301, 310, 802 P.2d 1000, 1009 (1990).

3             Finally, Hoenack cannot prove that any of the "damages" he claimed were the

4    result of the Board's actions and not his own outbursts.

5    **4.    The District Did Not Intentionally Inflict Emotional Distress On Hoenack Between August 14, 2021 and January 18, 2022.**

6             To establish an IIED claim in Arizona, a plaintiff must show that: (1) the

7    defendant intended to cause emotional distress or recklessly disregarded the near certainty that

8    such distress would result from his conduct; (2) the conduct by the defendant was extreme

9    and outrageous; and (3) severe emotional distress occurred as a result of defendant's conduct.

10   *Pankratz v. Willis,* 155 Ariz. 8, 13, 744 P.2d 1182, 1187 (App. 1987) (To support an intentional

11   infliction of emotional distress claim "[t]here must be conduct 'intended to inflict injury or

12   engaged in with the realization that injury will result."). To survive summary judgment, the

13   plaintiff must show that the defendant's acts were "so outrageous in character and so extreme

14   in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and

15   utterly intolerable in a civilized community." *Cluff v. Farmers Ins. Exch.*, 10 Ariz. App. 560, 562,

16   460 P.2d 666, 668 (1969) (quoting Restatement § 46, cmt. d). The issue may only go to the

17   jury where "reasonable minds may differ." *Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 199,

18   888 P.2d 1375, 1386 (App. 1994) (trial court must "make a preliminary determination" whether

19   conduct was extreme and outrageous). "Even if a defendant's conduct is unjustifiable, it does

20   not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that

21   would cause an average member of the community to believe it was 'outrageous.'" *Nelson*, 181

22   Ariz. at 199, 888 P.2d at 1386. Rather, "conduct necessary to sustain an intentional infliction

23   claim falls at the very extreme edge of the spectrum of possible conduct." *Watts v. Golden Age*

24   *Nursing Home*, 127 Ariz. 255, 257, 619 P.2d 1032, 1035 (1980).

25            Moreover, "[a] line of demarcation should be drawn between conduct likely to

26   cause mere 'emotional distress' and that causing 'severe emotional distress.'" *Midas Muffler Shop*

27   *v. Ellison*, 133 Ariz. 194, 199 (App. 1982) (citation omitted); *see also* Restatement (Second) of

28   Torts § 46 cmt. j (1965) (liability only arises when emotional distress is extreme; "Complete

20

emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people."). Thus, crying, being stressed and upset, and occasional trouble sleeping are not enough to establish severe emotional distress. *Midas Muffler Shop*, 133 Ariz. at 199. On the other hand, anxiety that results in physical symptoms such as high blood pressure, a nervous tic, chest pains, fatigue and dizziness may constitute severe emotional distress. *Ford v. Revlon*, 153 Ariz. 38, 41 (1987); *see also Pankratz v. Willis*, 155 Ariz. 8, 12, 17 (App. 1987) (anger and depression coupled with physical ailments such as headaches and hemorrhoids supported claim for emotional distress); *see also Harding v. Sternsher*, 1 CA-CV 16-0127, 2017 WL 3138184, at *3 (App. July 25, 2017).

Here, there is no evidence that the District intended to cause Hoenack severe emotional distress. As explained above, the actions taken by the Board during its meetings were an attempt to calm Hoenack down and return the discussions back to matters that related to the District's business. Hoenack himself admitted to losing his temper during these meetings and a superior court judge affirmed an IAH based on conduct from some of these meetings. None of the District Board members acts amounted to the requisite "extreme and outrageous" conduct to support an IIED claim when all they were attempting to do was restore order to Board meetings following one of Hoenack's many violent and disruptive outbursts. Finally, Hoenack did not suffer severe emotional distress as a result of his interactions with the District. He has been long diagnosed with ADHD and sleep issues. Hoenack has no medical expert to establish the District caused Hoenack to suffer the requisite _severe_ emotional distress (nor do his medical records support that he did either). Thus, this claim fails as a matter of law and undisputed facts.

### 5.   The District Did Not Invade Hoenack's Privacy Or Case Him To Be Cast In A False Light Between August 14, 2021 and January 18, 2022.

Hoenack claims that his right to privacy was invaded and that he was placed in a false light when Superintendent Gunning revealed to Board members that on March 2, 2021 he requested that he be given "permission to personally carry a concealed weapon on LESD grounds." [Doc. 1-4 at ¶¶ 187, 245-250].

Preliminary, as noted above, this claim is barred because Hoenack did not file his complaint within one year of this incident as required by A.R.S. § 12-821.01.  In addition, the acts that form the basis of Hoenack's false light claim were not the District Board acting as a whole and cannot constitute a valid claim against it. *See* A.R.S. § 15-421; A.R.S. § 15-341(A). The Board never took up or discussed Hoenack's request to bring a concealed weapon nor did the Board take a vote to convey that information to anyone. [Moran Dec. at ¶ 26]. Since none of the individual Board members are named in this action, this claim must fail because it is premised entirely on individual actors and not the Board. [*See* Doc. 1-4 at ¶¶ 187-193, 245-250 (discussing conduct by board member Moran and Superintendent Gunning only)].

Hoenack's false light claim fails on its merits. To prove a claim for false light invasion of privacy, Hoenack must prove that (1) he had a right to privacy with respect his request to the superintendant to carry a carry a concealed weapon on campus, (2) the District publicity gave the request which placed Hoenack before the public in a false light; (3) the light in which the Hoenack was placed would be highly offensive to a reasonable person and (4) the District had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the Plaintiff would be placed. *Reynolds v. Reynolds*, 231 Ariz. 313, ¶ 13, 294 P.3d 151, 156 (App. 2013) (quoting *Godbehere v. Phx. Newspapers, Inc.*, 162 Ariz. 335, 338, 783 P.2d 781, 784 (1989)); *see also Desert Palm Surgical Group, P.L.C. v. Petta*, 236 Ariz. 568, 580, ¶ 29 (App. 2015).

Here, Hoenack emailed the District Superintendent requesting authorization to permit him to bring a concealed weapon to board meetings because he had a concealed weapons permit ("CCW"). [SOF ¶ 111]. This request was later conveyed to the Board out of safety concerns. [SOF ¶ 112]. The Arizona Republic later made a public records request and obtained Hoenack's e-mail to the District Superintendent making this request and published an article regarding it. [SOF ¶ 113].  There was nothing "confidential" about Hoenack's request to carry a weapon on campus, which was later published by the Arizona Republic that gives rise to a false light claim "right to privacy" to this request. He was a public official making a

request to another public official in a communication that is subject to public records disclosure. There is simply no "right" or reasonable expectation to privacy for such a communication. Indeed, the Arizona Court of Appeals expressly determined that Hoenack's false light claim fails as a matter of law when he sued the Arizona Republic based on the same set of facts. *See Hoenack v. Gannett Co., Inc.*, 2023 WL 7890999, at *2, ¶ 11 (App. Nov. 16, 2023) ("[A] plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties.") (citing *Godbehere v. Phx. Newspapers*, 162 Ariz. 335, 343 (1989)); *id.* at ¶ 12 ("On this record, Hoenack has not shown that his request for 'permission to conceal carry a weapon on [District] property and its buildings' placed him in a false light.").

The District also did not publicly give any information regarding this request – as Hoenack pleads, it was obtained by a public records request. In addition, as the Arizona Court of Appeals held, the information conveyed were Hoenack's own words in his email – there was no "false light." Specifically, there is no evidence that anyone from the District, its Board or otherwise, made a public statement (let alone a false one) about Hoenack's request to carry a concealed weapon.

Finally, there is no evidence that the District had knowledge of or acted in reckless disregard as to the falsity of the publicized matter. Again, no one disputes Hoenack made this request. Put simply, just because Hoenack is embarrassed that his request to carry a concealed weapon was obtained and reported on by the media following a public records request does not mean he was placed in a false light by the District. Thus, this claim fails as a matter of law.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons the Court should grant the District's Motion for Summary Judgment in full and dismiss all of Hoenack's claims with prejudice.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED this 12th day of May, 2024.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Georgia A. Staton
    Georgia A. Staton
    Ravi V. Patel
    40 N. Central Avenue, Suite 2700
    Phoenix, Arizona 85004
    Attorneys for Defendant Litchfield
    Elementary School District Number 79

116925535.1

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on this 12th day of April, 2024, I caused the foregoing

3

document to be filed electronically with the Clerk of Court through the CM/ECF System for

4

filing; and served on counsel of record via the Court's CM/ECF system.

5

6

7

*/s/ Cecily N. Benson*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

116925535.1