**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| August Jeremy Hoenack, | No. CV-22-01903-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Litchfield Elementary School District No. 79, *et al.*, | |
| Defendants. | |

At issue is Defendant Litchfield Elementary School District's Motion for Summary Judgment (Doc. 73, MSJ), to which *pro se* Plaintiff August Jeremy Hoenack filed a Response (Doc. 86, Response) and Defendant filed a Reply (Doc. 84, Reply).[1] Defendant supports its MSJ with a Statement of Facts (Doc. 74, DSOF), and Plaintiff supports his Response with a Controverting Statement of Facts (Doc. 77-1, PSOF). The Court finds this matter appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons stated below, the Court grants Defendant's Motion for Summary Judgment.

**I.   Background**

This case, which Plaintiff filed in state court but which Defendant removed to federal court upon the basis of federal questions (Doc. 1), arises out of an acrimonious relationship between Plaintiff and the governing board of Defendant. Plaintiff was elected

---

[1] The document referred to herein as "Response" is an amended version of Plaintiff's original responsive memorandum. (Doc. 77.) Because Plaintiff lodged his amended response with the Court so soon after filing his initial response, Defendant directed its Reply to the amended document, rather than the original. The amended response is therefore the operative brief, and for the sake of simplicity the Court refers to it simply as "Response."

to the Litchfield Elementary School District governing board (the "Board") in January 2021, and he served on the Board until his resignation in January 2024. During his tenure on the Board, Plaintiff frequently found himself at loggerheads with the other Board members over the Board's endorsement and adoption of a variety of concepts that exist within the ideological umbrella of "critical race theory" ("CRT").[2] Plaintiff, who strenuously opposed Defendant's embrace of CRT, attempted to voice his concerns at numerous Board meetings, at which Plaintiff asserts that he was impermissibly silenced in derogation of his First Amendment rights and Arizona's open meeting law. Plaintiff has also brought tort claims asserting defamation, intentional infliction of emotional distress ("IIED"), and false light invasion of privacy, each of which arises out of the same aforementioned Board meetings and ancillary occurrences related thereto.

Plaintiff's first battery of allegations concern a Board meeting that occurred on March 3, 2021. (Doc. 1-4, Complaint at 10–18.) The Board scheduled this meeting in order to address two potential amendments to a teacher contract that Plaintiff had suggested. (Complaint at 9–10.) Specifically, Plaintiff proposed adding "improve academics" language to paragraph 2 of the teacher contract and "prohibit teaching CRT" language to paragraph 17 of the same. (Complaint at 9 ¶ 42.) The Board had initially scheduled discussion of Plaintiff's suggestions for February 23, but it postponed the deliberation by one week so that it could procure advice of counsel regarding the recommended contractual alterations. (Complaint at 9–10.) Accordingly, the Board decided to address Plaintiff's tabled amendments in an "executive session," which is a closed meeting that a public body may convene for, *inter alia*, consultations with counsel, A.R.S. § 38-431.03(A)(3). (Complaint at 9–10.) Plaintiff asserts that the Board's convocation of an executive session to discuss his proposed contractual amendments constituted a "ruse" designed to "bury" Plaintiff's opinion and conceal it from the public. (Complaint at 9 ¶ B.) Plaintiff further

---

[2] The Court is aware that the phrase "critical race theory" carries an enormous variety of connotations, so much so that it no longer functions as a precise descriptor of any particular set of ideas. However, the term is sufficient for the Court's purposes because (1) both Plaintiff and the other Board members used the term contemporaneously to describe the object of their dispute and (2) the precise sociological contours of the Board's internal dissension is immaterial to the resolution of Defendant's MSJ.

alleges that the Board's description on its meeting agenda of his proposed changes was insufficiently specific and therefore violated A.R.S. § 38-431.02(H), which mandates that "[a]gendas required under this section shall list the specific matters to be discussed, considered or decided at the meeting." (Complaint at 11 ¶¶ 51–52.) The agenda for the March 3 meeting stated only that the Board would convene an executive session "for the purpose of receiving legal advice from the attorney for the public body and potentially directing the attorney regarding the form and content of employment contracts for all employee groups" and that the Board would then reconvene an open meeting at which the Board might vote on the proposed contract language. (Doc. 1-4, Ex. F at 3–4.) However, the agenda did not include the specific text suggested by Plaintiff, or even a summary thereof.

In addition to alleging that the Board fell afoul of Arizona's open meeting law by abusing procedure and manipulating the agenda for the March 3 meeting, Plaintiff also asserts that the Board "restricted discussion of issues related to the agenda item in violation of the Open Meeting Law" and "knowingly violated the [open meeting law] and [Plaintiff's] Constitutional rights by banning free expression . . . directly prior to a vote on said contracts." (Complaint at 11–13.) In attempting to expound upon the need for his proposed contractual changes, Plaintiff, who is self-professedly not a confident public speaker, read from a pre-written speech that he admits was "at times colorful." (Complaint at 11 ¶ 54.) The speech opened with a lengthy exposition concerning an "equity statement" that the Board had previously adopted, which Plaintiff and a segment of the public vehemently opposed. (*See* Complaint at 13 ¶¶ 64–65.) The Board felt that relitigation of the equity statement was not related to the teacher contract at issue in the meeting and instructed Plaintiff to confine his statements to the topics on the agenda. Plaintiff maintained that the equity statement was related to the teacher contract and therefore refused to deviate from his speech. The meeting became tense and eventually devolved into aggression, and Plaintiff was never able to complete his speech. Although the Complaint phrases it in a variety of ways, the essence of Plaintiff's claim is that he was

impermissibly silenced. Plaintiff states that "[i]t can only be understood by watching the video" (Complaint at 11 ¶ 55), and the Court agrees, with respect to both the March 3 meeting and all subsequent meetings. Finally, Plaintiff claims that the Board's conduct at the meeting was malicious, false, harassing, mob-like, and "unprecedented in a civilized country" and that such conduct irreparably damaged Plaintiff's reputation, health, well-being, and psyche. (Complaint at 15–16 ¶ 80.)

The next relevant meeting occurred on April 13, 2021. (Complaint at 18–20.) Plaintiff alleges that the Board violated his constitutional rights and Arizona's open meeting law by restricting his comments to the equity statement, which this time was on the agenda, instead of letting him also address certain "transformational equity work," which was not on the meeting agenda but which Plaintiff asserts was "inextricably related to" the equity statement. (*See* Complaint at 20 ¶ 114.) Furthermore, Plaintiff alleges that the Board violated his constitutional rights by deliberately allowing and encouraging a member of the audience to harass him. (Complaint at 19–20). Plaintiff presents similar claims regarding a meeting that occurred on April 27, 2021.

On May 11, 2021, the Board held a meeting at which Plaintiff was supposed to conduct an event called an "activity to unite." (Complaint at 23.) As with the previous meetings, the Board felt that Plaintiff's speech was a divisive diatribe, whereas Plaintiff maintains that his speech existed within the bounds of the definition of an "activity to unite." The meeting became chaotic, and Plaintiff was prevented from concluding his intended remarks. Plaintiff alleges that the Board's conduct at this event trampled his right to free expression and humiliated him. Plaintiff makes similar allegations regarding meetings that occurred on June 8 and August 10 of the same year, as well as a meeting that occurred on January 11, 2022. (Complaint at 24–26.) At a particularly acrimonious meeting on March 15, 2022, Plaintiff alleges that the Board once again silenced him in derogation of Arizona's open meeting law by decreeing that his discussion of Russian President Vladimir Putin's invasion of foreign countries was off topic. Plaintiff maintains that the

subject of communist aggression was related to a movie on American education he had recently watched and was scheduled to report upon. (Complaint at 27–28.)

As noted above, the March 15 meeting was especially raucous. Shortly after that meeting, a member of the Board filed a police report and eventually obtained an injunction against harassment that prevented Plaintiff from attending future meetings in person. Plaintiff contends that the Board obtained this injunction by way of perjured statements from several members that fabricated his conduct at the March 15 meeting. (Complaint at 28–29.) In a supplemental complaint, Plaintiff alleges that, following his relegation to Zoom, the Board deliberately created and/or feigned a variety of technical difficulties to prevent him from participating at Board meetings. (Doc. 36 at 1–4.) Plaintiff further contends that the Board's Zoom procedure, according to which he needed to first virtually raise his hand before being manually unmuted by the Board, chilled his speech in violation of the First Amendment. (Doc. 36 at 5–6.)

Plaintiff's state-law tort claims for defamation and IIED relate to the entire course of conduct described above, but Plaintiff also brings a claim for invasion of privacy predicated on a specific transaction not yet described. In March 2021, Plaintiff lodged a request with Defendant's superintendent to "personally carry a concealed weapon on [Litchfield Elementary School District] grounds." (Complaint at 29 ¶ 187.) Plaintiff alleges that the superintendent conveyed his request to the Board, one member of which "was in contact with Taylor Seely, a reporter for AZCentral and the Arizona Republic." (Complaint at 29 ¶ 188.) Ms. Seely then apparently lodged a FOIA inquiry seeking Plaintiff's concealed-carry request and eventually reported upon the request in the news media. Plaintiff asserts that the Board, by divulging confidential information to a reporter, invaded his privacy and intentionally inflicted emotional distress upon him. (*See* Complaint at 30 ¶ 193.)

Plaintiff's Complaint initially named as defendants the school district, several Board members, the superintendent, and the Board's counsel. (Complaint at 1.) However, Plaintiff voluntarily dismissed all defendants except for the school district, which remains

the sole Defendant. (Doc. 1-6.) The relief sought by Plaintiff, excluding that which has become moot by virtue of the dismissal of the individual defendants, includes a declaration that Defendant violated Arizona's open meeting law, an injunction requiring that Defendant comply with the open meeting law, a civil penalty for Defendant's violation of the open meeting law, damages under 28 U.S.C. § 1983 for First Amendment violations and under state law for the various tort claims, and attorney fees. (Complaint at 40.) Defendant has moved for summary judgment with respect to all of Plaintiff's claims.

## II.     Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id*. at 1103. Summary judgment is appropriate against a party that "fails to make a showing

1  sufficient to establish the existence of an element essential to that party's case, and on
2  which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

3        In considering a motion for summary judgment, the court must regard as true the
4  non-moving party's evidence, as long as it is supported by affidavits or other evidentiary
5  material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest
6  on its pleadings; it must produce some significant probative evidence tending to contradict
7  the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57
8  (holding that the plaintiff must present affirmative evidence in order to defeat a properly
9  supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045
10 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on
11 conclusory allegations unsupported by factual data." (citation omitted)).

12 **III.   Analysis**

13       With the exception of Plaintiff's claims regarding the allegedly fraudulent
14 injunction against harassment and the alleged invasion of his privacy concerning his
15 concealed-carry request, all of Plaintiff's claims relate to the manner in which the Board
16 conducted its various meetings. For purposes of analytical organization, the Board's
17 meeting-related conduct can be subdivided into three categories: (1) the Board's utilization
18 of an executive session and an imprecise agenda item during the March 3, 2021 meeting;
19 (2) the Board's manner of presiding over the various in-person meetings; and (3) the
20 Board's implementation of a Zoom protocol following the injunction precluding Plaintiff
21 from attending meetings in person. The Court will address each of the three categories in
22 turn, before proceeding to the claims arising out of the injunction against harassment and
23 the concealed-carry request.

24       **A.   Claims Relating to the March 3, 2021 Executive Session and Agenda**

25       The first category is the easiest to dispose of, as Plaintiff's claims falling therein
26 lack a basis in law. As noted above, Plaintiff argues that the Board's convocation of an
27 executive session was a "ruse" designed to "prohibit discussion" in derogation of Arizona's
28 open meeting law. However, Arizona law expressly permits the use of executive sessions

1  generally for "[d]iscussion or consultation for legal advice with the attorney or attorneys
2  of the public body" and specifically for "[d]iscussion or consultation with the attorneys of
3  the public body in order to consider its position and instruct its attorneys regarding the
4  public body's position regarding contracts that are the subject of negotiations." A.R.S. § 38-
5  431.03(A)(3), (4). The Board called an executive session to discuss possible amendments
6  to a teacher contract that Plaintiff had proposed. The Board's actions were therefore within
7  the explicit contemplation of Arizona's open meeting law. Plaintiff also argues that the
8  Board violated A.R.S. § 38-431.02(H) by placing on the agenda only a generalized
9  description of Plaintiff's suggestions that were to be discussed in the executive session,
10 rather than a specific item that detailed the precise changes Plaintiff had proposed.
11 Plaintiff's claim once again runs directly contrary to Arizona's open meeting law.
12 "Notwithstanding the other provisions of this section, notice of executive sessions shall be
13 required to include only a general description of the matters to be considered." A.R.S. § 38-
14 431.02(I). Thus, both of Plaintiff's claims arising out the Board's conduct preceding the
15 March 3, 2021 meeting fail.

### B.     Claims Relating to the Meetings in General

Plaintiff's claims falling within the second category enumerated above are not facially frivolous and consequently demand an examination of the evidence proffered by the parties. The parties appear to agree that the video evidence is dispositive as to Defendant's MSJ regarding the claims at issue in the second category. (*See* Response at 2 ("LESD's accounts of what transpired at board meetings is based on fabricated disingenuous statement [sic] in their declarations rather than the truth, which is seen and heard in videos of the meetings."); Response at 3 ("This case is also about Video v Hearsay."); Response at 6 ("Please watch the Video Summaries! Hoenack's position on all meetings including ones not specifically mentioned here such as on or about 3/16/21 is better stated on the summary videos."); Response at 9 ("The simple part of this case is that it's all recorded on video. LESD's facts are false because they are contradicted by video."); Response at 15 ("So this case is about what LESD says vs what the video actually

shows . . . ."); Reply at 4 ("[T]he video evidence cited in support of the District's statement of facts demonstrates its facts are *indisputable*." (emphasis in original)).) Both parties submitted video evidence in support of their briefing. (Doc. 75; Doc. 87.) After viewing the evidence, including both the video and non-video submissions, the Court concludes that Defendant has carried its burden of demonstrating the absence of any genuine dispute of material fact and that Plaintiff has failed to carry his rebuttal burden. *See Nissan Fire*, 210 F.3d at 1103. Although the Court has considered all the evidence, the Court will focus its analysis upon Plaintiff's proffered evidence because Plaintiff bears the burden of production both as a general matter and for the purposes of rebutting Defendant's initial showing of the absence of a genuine dispute of material fact. Plaintiff submitted video evidence totaling approximately 40 minutes separated into six video files, each of which contains footage from different meetings spliced together. Only the fourth and fifth video files are materially relevant to Plaintiff's claims. (See Doc. 87.)

The Ninth Circuit has expounded upon the legal standard that governs the adjudication of First Amendment challenges brought in the context of public meetings.

> [A] City Council meeting is still just that, a governmental process with a governmental purpose. The Council has an agenda to be addressed and dealt with. Public forum or not, the usual first amendment antipathy to content-oriented control of speech cannot be imported into the Council chambers intact. In the first place, in dealing with agenda items, the Council does not violate the first amendment when it restricts public speakers to the subject at hand. While a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing, it certainly may stop him if his speech becomes irrelevant or repetitious.
>
> Similarly, the nature of a Council meeting means that a speaker can become "disruptive" in ways that would not meet the test of actual breach of the peace or of "fighting words" likely to provoke immediate combat. A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner. Indeed, such conduct may interfere with the rights of other speakers.
>
> . . .

> Of course the point at which speech becomes unduly repetitious or largely irrelevant is not mathematically determinable. The role of a moderator involves a great deal of discretion. Undoubtedly, abuses can occur, as when a moderator rules speech out of order simply because he disagrees with it, or because it employs words he does not like. [Under a valid limitation,] [s]peakers are subject to restriction only when their speech disrupts, disturbs or otherwise impedes the orderly conduct of the Council meeting.

*White v. City of Norwalk*, 900 F.2d 1421, 1425–26 (9th Cir. 1990) (internal citations and quotation marks omitted). The *White* standard, which was announced in the context of a city council meeting, also governs other governmental board meetings, including those of school boards. *See Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 270 (9th Cir. 1995). Thus, Defendant is entitled to summary judgment on Plaintiff's First Amendment claim if the evidence demonstrates that the Board restricted Plaintiff's speech only within the bounds of its constitutionally permissible discretion relating to its authority to keep meetings organized, efficient, and on topic.

Plaintiff's video evidence clearly establishes, contrary to his assertions, that the Board did not silence him due to animus, viewpoint discrimination, or any other motive anathema to the First Amendment. No reasonable juror could find otherwise. At each of the meetings depicted in Plaintiff's video summaries, the Board restricts Plaintiff's speech only after (1) Plaintiff strays from the agenda or (2) the meeting devolves into chaos. Although there are numerous meetings at issue in this case, descriptions of a few of the more significant meetings will serve as illustrations of the general flaw in Plaintiff's claims.

At the March 3, 2021 meeting, which has already been described in some detail, the Board reconvened an open meeting after concluding its executive session. The stated purpose of the meeting was to discuss the two contractual amendments that Plaintiff had proposed, namely the insertion of language pertaining to "improve academics" and "prohibit teaching CRT." Upon receiving the floor, Plaintiff first recounted his oath to uphold the Constitution against domestic enemies. He then entered into a tripartite description of the past, present, and future of education within the district. Next, Plaintiff recounted how the Board had surrendered its judgment to racist special-interest groups

intent upon destroying the school system. Plaintiff then began to chronicle a series of letters in support of and in opposition to the prior reopening of the district's schools. At this point, the Board's counsel politely informed Plaintiff that he was straying from the meeting's agenda, which exclusively addressed the two linguistic changes to the teacher contract. Plaintiff responded aggressively, at which point other members of the Board interjected to note that Plaintiff had deviated from the agenda and should return to the matter at hand. Plaintiff regained his composure and argued that his speech was related to the contract and was designed to provide background for his suggested changes. After a tense back-and-forth, the Board member agreed that Plaintiff's remarks constituted germane background information and retracted her objection. Plaintiff then continued his speech but soon thereafter embarked upon an attack of the Board's prior adoption of an equity statement. The Board and its counsel then reasserted their objection that the equity statement was unrelated to the proposed contractual amendments. At this point, the meeting devolved into unproductive argument, and the Board eventually proceeded to a vote without permitting Plaintiff to complete his speech.

      On the one hand, it is clear that Plaintiff's speech *in some manner* related to the items on the agenda. On the other hand, it is also clear that Plaintiff's speech sought to dredge up and debate the propriety of numerous items from the past. Moreover, the tone and substance of Plaintiff's speech was combative. Plaintiff's speech was aimed more at relitigating the past than at discussing the present. The past obviously relates to the present, but it was not the Board's duty to permit an extensive (and aggressive) examination of the past as a necessary prelude to deliberation of the contract that was the subject of the meeting. As the Board enjoys a "great deal of discretion" in regulating its meetings and determining when speech crosses the threshold into repetition, irrelevancy, or disruption, it was clearly acting within its prerogative in insisting that Plaintiff confine his remarks to the contract at hand, rather than the full universe of events that bore some relation to the contract. There is thus no genuine question of fact regarding whether the Board abused its discretion in regulating its meeting. Although there is certainly a sound argument that

Plaintiff's speech related to the items on the agenda, Plaintiff's speech was also plainly aggressive and digressive to such an extent that no reasonable juror could find that the Board transgressed its broad discretion and thereby violated Plaintiff's First Amendment rights in seeking to reorient Plaintiff's speech to the subject contract. Plaintiff's constitutional claims concerning the March 3 meeting therefore fail.

Plaintiff also asserts that the Board's conduct in presiding over the meeting violated Arizona's open meeting law. However, Plaintiff's claims predicated on the open meeting law are highly generalized and do not pertain to any particular provision of the open meeting statutes. They are essentially corollaries to his constitutional claims, asserting not that the meetings were literally closed but that they were instead insufficiently open by virtue of restrictions placed on Plaintiff's speech in relation to the meeting agendas. But Plaintiff has cited no authority, and the Court is aware of none, indicating that a standard other than the *White* standard would govern such a claim. Therefore, the *White* standard controls the analysis of whether the Board's conduct trampled Plaintiff's speech to such an extent as to violate Arizona's open meeting law. This is consistent with the text of Arizona's open meeting statute, which delineates permissible official speech at public meetings in terms of whether that speech is related to the meeting agenda. *See* A.R.S. § 38-431.02(H) ("The public body may discuss, consider or make decisions *only* on matters listed on the agenda and other matters related thereto." (emphasis added)). Nothing in the open meeting law indicates that a presiding officer's discretion in setting or enforcing the agenda differs from the standard that governs in the First Amendment context. Plaintiff's state-law speech claims therefore fail for the same reasons as his federal speech claims.[3]

---

[3] In seeking to vindicate his position before the Court, Plaintiff points to an Arizona Attorney General letter indicating that Plaintiff did not stray so far from the March 3 agenda as to have violated the open meeting law himself. (Doc. 1-4, Ex. A at 4.) However, in opining that Plaintiff did not himself violate the open meeting law, the Attorney General expressly did not conclude that the Board committed a violation of its own. By its own terms, the letter is not dispositive here. The Court concludes that there is substantial space between a speaker's violation of the open meeting law for being off topic and a Board's violation of the open meeting law for overly restrictively enforcing its agenda. It is in this space that the Board's broad discretion operates.

At the April 13, 2021 meeting at which Plaintiff was harassed by a member of the audience loudly accusing him of being a "pedo," the video evidence clearly shows the Board attempting to reestablish order by calming down both Plaintiff and the audience, and the Board repeatedly directs its requests for quiet to the disruptive audience member. Contrary to Plaintiff's allegations, there is simply no evidence that the Board encouraged or permitted the audience member to harass Plaintiff. At the same meeting and at a subsequent meeting on April 27, the Board stated that it was "agendized to speak about the equity statement, and only the equity statement" and that "we're talking only about having an equity statement; we are not talking about the specific content in the equity statement at this point; more generally about having an equity statement." The Board then clarified that "right now we're just gonna think about an equity statement in general, the merits of an equity statement, and do we want to move forward with one. So we're starting with a fresh slate here; let's leave the past in the past and let's just focus on moving forward." At both meetings, Plaintiff attempted to relitigate the past, including past iterations of equity statements and past implementation of transformational equity work. The Board redirected his focus to the more abstract subject of the meetings, namely equity statements writ large. Plaintiff mostly complied with the Board's nudges, and there was little acrimony between Plaintiff and the Board (unlike the pronounced acrimony between Plaintiff and the audience member). Once again, no reasonable juror could find that the Board's conduct in setting or enforcing its agenda silenced Plaintiff to a degree violative of the First Amendment or Arizona's open meeting law.

At a meeting on May 11, 2021, Plaintiff was charged with conducting an "activity to unite," which is an idiosyncratic activity, the contours of which the Board defines in its discretion. Plaintiff's activity to unite was an attack on the perceived failures and inadequacies of contemporary American schooling in general and Defendant in particular. The Board interrupted Plaintiff after a few minutes on the grounds that Plaintiff's speech did not constitute an activity to unite. Despite the overwhelmingly negative tenor of Plaintiff's activity to unite, Plaintiff maintained that he was simply attempting to unify the

community around the goal of improving academics. The Board reasserted its objection, but Plaintiff simply raised his voice and proceeded to talk over the Board, shifting his focus to the Board's embrace of racism and dissension and singling out individual members of the Board for attack. The meeting then devolved into a yelling match.

Plaintiff's speech was plainly not unifying. Indeed, it was unequivocally divisive. Beyond that, Plaintiff's defense of his speech hinges upon semantic sophistry, ignoring the fact that an "activity to unite" is an agenda item that the Board is entitled to discretionarily define. No reasonable juror could find that the Board's conduct in insisting that activities to unite be unifying constituted an infringement of Plaintiff's constitutional rights or a violation of Arizona's open meeting law.

At a March 15, 2022 meeting, a member of the Board politely cut Plaintiff off when Plaintiff began to talk about the relationship between the Board's embrace of CRT, Putin's "squish[ing]" of foreign countries, and the price of oil. Plaintiff then commanded the Board member to "shut [her] mouth," after which Plaintiff became increasingly aggressive and eventually found himself shouting insults into the microphone. Plaintiff's behavior was manifestly disruptive, shockingly aggressive, and flatly unacceptable for a public meeting, as well as off topic. No reasonable juror could find otherwise. Following this meeting, Plaintiff was enjoined by a state court from attending future gatherings of the Board in person and consequently began appearing by Zoom. The Zoom meetings are the subject of the next section of this Order.

In sum, there is simply no evidence that the Board ever silenced Plaintiff in any manner inconsistent with the First Amendment or Arizona's open meeting law at any of the in-person meetings at issue in this case. Plaintiff's speech-related claims therefore fail. Plaintiff's ancillary claims for defamation and IIED are intimately bound up with his free-speech claims, and they consequently also fail. Of course, defamation and IIED do not require a showing of speech suppression as a matter of law, but in this case Plaintiff hinges those claims upon the same alleged repression of speech that underlies his First Amendment and open-meeting claims. (Complaint at 36 ¶ 226, 37 ¶ 231, 38 ¶ 237.)

Defamation requires a maliciously false statement, and IIED requires an extreme or outrageous act. Plaintiff attempts to satisfy the elements of these claims by asserting that the Board's statements at its meetings that Plaintiff was off topic and generally behaving inappropriately constitute the false, malicious, and outrageous acts required to support defamation and IIED. Having rejected that premise for the reasons set forth above, the Court concludes that Plaintiff's tort claims fail for want of factual support.[4]

### C. Claims Related to the Zoom Meetings

Plaintiffs claims related to the Zoom meetings also fail, but for different reasons than those discussed above. Unlike at the in-person meetings, Plaintiff *was* silenced during certain Zoom meetings in 2022 and 2023, at least to some extent. Plaintiff's video evidence shows that the audio problems and other technological difficulties prevented him from meaningfully participating in some of the Board's proceedings. However, contrary Plaintiff's assertions, he presents no evidence that any of the Zoom difficulties were the product of deliberate machinations by the Board. First, there is no evidence that the audio problems were anybody's fault. The evidence merely establishes that audio problems occurred, but it sheds no light on why they occurred or which party or non-party might bear responsibility for such problems. Moreover, Defendant has produced substantial unrebutted evidence that Plaintiff refused to cooperate with the Board's attempt to remediate the audio problems, including the Board's suggestions that Plaintiff attend the meetings remotely from a different location within the school district or that an IT specialist be present at Plaintiff's home during the meetings. (MSJ at 7.) The evidence also shows that the Board eventually resolved the audio issues through a good-faith, ameliorative effort. (MSJ at 7.) Second, although the evidence does show that the mute/unmute issues were the Board's fault in a literal sense, the evidence clearly establishes that the Board bears no culpability. Although the presiding Board member's technological ineptitude kept Plaintiff muted for longer than was necessary, the Board stopped the meeting each time the

---

[4] Defendant asserts several legal defenses to Plaintiff's tort claims, including legislative immunity, the limitations period, the notice-of-claim period, the absence of respondeat superior, and the absence of damages. (MSJ at 17–23.) Because Plaintiff's claims lack a basis in fact, the Court does not reach Defendant's legal arguments.

issue arose and sought technical assistance from its on-site IT advisor. After a delay, Plaintiff was able to address the meeting. Third, the Board's decision to employ a protocol by which Plaintiff was unable to unmute himself did not violate Plaintiff's constitutional rights or Arizona's open meeting law, and no reasonable juror could find otherwise. Over the preceding year, Plaintiff had routinely behaved disruptively, rudely, aggressively, and digressively. The Board's decision to employ a manual unmute requirement was reasonable under the circumstances, and there is no genuine dispute as to whether the Board abused its broad discretion in so acting.

In sum, Plaintiff did face some impediment to his speech during the Zoom meetings, but he was by and large still able to express himself. Crucially, there is no evidence that the Board is responsible for any undue restriction on Plaintiff's speech during the Zoom meetings. Accordingly, Plaintiff's claims related to the Zoom meetings fail.

### D. Claims Related to the Injunction Against Harassment

Plaintiff asserts that the injunction against harassment procured against him by one particular Board member, Ms. Moran, amounts to a restraint placed on Plaintiff's speech by the Board. This contention fails for a number of reasons. Plaintiff's attempt to transmute an individual Board member's injunctive proceeding into collective Board action rests on the fact that several other Board members testified as witnesses at the injunctive proceeding. Thus, Plaintiff argues that a "quorum" of the Board was present at the injunctive proceeding such that the hearing became official Board conduct. First, Plaintiff's argument does not track the statute, as an official "legal action" no longer hinges upon a majority of Board members being present, as it once did. Since 2000, a "legal action" has been defined as "a collective decision, commitment or promise made by a public body pursuant to the constitution, the public body's charter, bylaws or specified scope of appointment and the laws of this state." *See* 2000 Ariz. Sess. Laws ch. 358, § 1 (2d Reg. Sess.). Plaintiff fails to adduce any coherent argument as to how certain members' serving as witnesses at a harassment adjudication could constitute a collective decision, commitment or promise made pursuant to the Board's scope of authority. Plaintiff's

position is simply not credible, and no more need be said on the matter. In any event, the Court already determined that "Plaintiff has not shown that the District took any material adverse action against him with respect to the Zoom-only restriction imposed by the Justice Court." (Doc. 24 at 5–6.) The Court will not revisit its prior determination. Thus, Plaintiff's allegations concerning the injunctive proceeding are not relevant to his claims against Defendant in this case.

Additionally, the Court cannot credit Plaintiff's claims regarding the injunction against harassment without violating the *Rooker-Feldman* doctrine, which it will not do. Plaintiff's claim rests on his argument that Defendant violated the law by sanctioning Ms. Moran's perjury regarding what occurred after the March 15, 2022 meeting ended. Plaintiff has already presented his objections to Ms. Moran's testimony to both the Hassayampa Justice Court and the Maricopa County Superior Court. (DSOF Ex. 6 at 63–74; DSOF Ex. 7.) Moreover, the lower courts viewed and found non-dispositive the exact evidence that Plaintiff now predicates his perjury argument on, namely his bodycam footage from the end of the March 15 meeting. (*Compare* DSOF Ex. 6 at 63–74, *with* Response at 14.) Plaintiff's claim is therefore "a forbidden 'de facto appeal' of a prior state court judgment" under the *Rooker-Feldman* doctrine, which prohibits federal courts from sitting as appellate tribunals over state court adjudications. *See Gimbel v. California*, 308 F. App'x 124, 126 (9th Cir. 2009) (holding that a plaintiff "cannot evade the *Rooker*/*Feldman* bar by pleading his claims through the vehicle of 42 U.S.C. § 1983"). Thus, just as in a prior order, this Court will not "declare that the Injunction is 'null and void.'" (*See* Doc. 24 at 6.) Without an impermissible relitigation of the injunction against harassment, there is no factual predicate to support any of Plaintiff's claims arising out of the injunctive proceeding.

### E.   Claims Related to Plaintiff's Concealed-Carry Request

Plaintiff claims that Defendant invaded his privacy and cast him in a false light by sharing with a reporter that Plaintiff had requested permission to carry a concealed weapon on school premises. The reporter filed a FOIA request, obtained Plaintiff's concealed-carry

request, and published an article about Plaintiff's request to carry a weapon, although Plaintiff does not cite to this article in either his Complaint, his Response, or his PSOF. In a separate action in state court, Plaintiff sued the publisher of the offensive article for false light invasion of privacy. In rejecting his claim, the Arizona Court of Appeals held that "the reporting of Hoenack's request related to his duties as a Board member." *Hoenack v. Gannett Co.*, No. 1 CA-CV 23-0020, 2023 WL 7890999, at *2 ¶ 11 (Ariz. Ct. App. Nov. 16, 2023), review denied (June 3, 2024). "[A] plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties." *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 343 (1989) (emphasis omitted). Thus, Plaintiff's claim for false light invasion of privacy failed because it arose out of public matters. The Court sees no error in the state court's analysis and would honor its holding in any event under the doctrine of issue preclusion. *See Crosby-Garbotz v. Fell*, 246 Ariz. 54, 57 ¶ 11 (2019).

Because Plaintiff's request to carry a weapon on Defendant's property related to his official duties as a member of Defendant's governing board, and because the same operative facts underlie Plaintiff's claim here against Defendant as underlay Plaintiff's claim in state court against the newspaper, Plaintiff can no more assert a false light claim against Defendant than he could against the newspaper. Thus, Plaintiff's claim fails as a matter of law.

Additionally, Plaintiff has failed to produce any evidence indicating that the Board's statement to the reporter cast Plaintiff in a light that was in any manner false. Unlike a claim for defamation, which requires a false statement, "even a true statement may form the basis for false light liability if it creates a false implication about the person." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, 580 ¶ 29 (Ct. App. 2015). Plaintiff's only allegation bearing upon the alleged falsity of the relevant light is a contention that a weapon is not necessarily a gun, so it was therefore false to equate his request to carry a concealed weapon with a request to carry a concealed gun. (Complaint at 30 ¶ 190.) This attempt at splitting hairs lacks all force in light of the fact that Plaintiff has not alleged to

the Court that the weapon he sought to carry was anything other than a gun. Thus, for more than one reason, there is no genuine dispute of material fact concerning Plaintiff's claim for false light invasion of privacy.

## IV. Conclusion

At bottom, none of the Board's actions create a cognizable legal claim against Defendant. This case arises out of a contentious public debate over critical race theory that sundered the entire nation. As between the parties here, that public debate frequently became obscured by rancor and aggression. More often than not, however, responsibility for the animosity lay with Plaintiff, not Defendant. The Court in no way doubts Plaintiff's sincerity in doing his duty to his community and defending what he believed to be right and just. And the Court expresses no position on the underlying dispute regarding the benefits and detriments of incorporating critical race theory into public school curricula. However, none of Plaintiff's legal claims have merit. Accordingly, Defendant is entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** granting Defendant's Motion for Summary Judgment. (Doc. 73.)

**IT IS FURTHER ORDERED** denying Defendant's Motion to Strike as moot. (Doc. 89.)

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in Defendant's favor and close this case.

Dated this 1st day of October, 2024.

Honorable John J. Tuchi
United States District Judge